UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TROY ASH,

            Plaintiff,

    v.                             Case No. 21-CV-1329-JPG

ANDY GARDEN, et al.,

            Defendants.

## MEMORANDUM AND ORDER

This matter comes before the Court on the Defendants' motion for Summary Judgment (Doc. 31).[1] The Defendants filed their motion on March 22, 2023. Finding that some of the Plaintiff's claims alleged against Jail Administrator Troy Reed present a genuine dispute of material fact, the Court **GRANTS in part and DENIES in part** summary judgment.

The Court **GRANTS** summary judgment as to Sgt. B. Carter, Sgt. C. Carter, and Sheriff Andy Garden on all counts. The Court **GRANTS** summary judgment as to Administrator Reed on Count Three, but **DENIES** summary judgment for Administrator Troy Reed in his official and individual capacity on Count One and Count Two.

## I.  BACKGROUND

### A.  Procedural History

On January 12, 2022, the Plaintiff filed an amended complaint alleging that the Defendants violated his Fourteenth Amendment rights as a pretrial detainee by failing to protect him from illness and subjecting him to unconstitutional conditions of confinement. (Doc. 13). The Plaintiff named four defendants in his suit: Sgt. B. Carter, Sgt. C. Carter, Sheriff Andy

---

[1] Unless otherwise indicated, all document references have been filed in the instant case.

Garden, and Jail Administrator Troy Reed. Upon merit review, the Court allowed the Plaintiff to

proceed on three counts under 42 U.S.C. § 1983 (Doc. 14)[2]:

**Count One:** Defendants Garden and Reed exposed Plaintiff to black dust and poor ventilation in E Block, beginning July 24, 2021, and in C Block, starting on December 4, 2021, resulting in "constant" eye irritation, coughing, and sneezing, in violation of the Fourteenth Amendment due process standard applicable to pretrial detainees.

**Count Two:** Defendants B. Carter, C. Carter, and Reed exposed Plaintiff to black dust, poor ventilation, and inmates in quarantine for COVID-19 in B Block beginning December 16, 2021, without taking precautionary measures to prevent illness, in violation of the Fourteenth Amendment due process standard applicable to pretrial detainees.

**Count Three:** Defendants Garden, Reed, B. Carter, and C. Carter disregarded the statewide mask mandate that went into effect on [August 30], 2021, despite Plaintiff's requests, grievances, and/or complaints about the serious risks posed to his health and safety by COVID-19 and its variants, all in violation of the Fourteenth Amendment due process standard applicable to pretrial detainees.

Garden, B. Carter, and C. Carter were sued in their individual capacity while Reed was

sued in both his individual and official capacity.

### B. Plaintiff's Detention

The Plaintiff, Troy Ash, was detained on July 17, 2020, on drug and gun charges. (Case

No. 4:20-cr-40061-JPG-2, Docs. 1, 42). On July 1, 2021,[3] the Plaintiff was detained at the

Marion County Jail. From July 1 to November 12, he was housed in C Block. From November

13 to November 24, the Plaintiff was placed in segregation in R Block for disciplinary reasons.

From November 24 to December 17, he was returned to C Block. From December 18 to January

12, 2022, he was housed in B Block. On January 13, 2022, he was moved to E Block until he

was sentenced and taken into custody by U.S. Marshals in July of 2022.

---

[2] The Plaintiff was a pretrial detainee from his arrival at the jail until his plea of guilty on March 22, 2022. (Case No. 4:20-cr-40061-JPG, Doc. 215). While the Plaintiff has included some facts related to incidents from March 22, 2022, onward; because the Plaintiff's complaint only alleges violations of his Fourteenth Amendment rights as a *pretrial* detainee, the Court will only analyze claims that arose before his guilty plea.
[3] Unless otherwise stated, all dates are in 2021.

From December 2 through December 17 and on December 30, the Plaintiff was housed with another prisoner, for the rest of his time, the Plaintiff did not have a cellmate. (*Id*.). The Plaintiff was allowed one hour in the day room alone during his time at the jail.

While imprisoned, the Plaintiff submitted ten grievance forms, five on ventilation-related issues and five on COVID-related issues. Due to their numerosity, the Court will not reference all individually. Importantly, the Plaintiff had tuberculosis as a child. The Defendants were aware of the Plaintiff's condition, the unique impact respiratory problems would have on the Plaintiff, and the Plaintiff's anxiety about his health as a result.

### **Mold Exposure Claims**

At an unspecified date, an AMERESCO project manager noticed discoloration around the jail's Housing Unit Control Room (Doc. 32). On September 27, 2021, Environmental Consultants, LLC, tested the discoloration and concluded it was mold. (*Id*.). Despite its black color, the mold was identified as a non-toxic variety (*Cladosporium*), not "Black Mold" (*Stachybotrys chartarum*).

Environmental Consultants's report included an attachment published by the Environmental Protection Agency on mold remediation. ASSESSMENT & REMEDIATION OF MOLD, E.P.A. (2001) https://www.epa.gov/sites/default/files/2014-08/documents/moldremediation.pdf (EPA 402-K-01-001). The attachment stated that any resolution strategy, designed by a remediation manager, would involve using their professional judgment to decide the extent of the mold problem and remediation plans. The document also stated that if mold in air ducts or an HVAC system is suspected (as here) one should not run the HVAC system but consult EPA guidance on air duct cleaning. Said guidance states that one should consider cleaning air duct systems if there is significant mold growth and warns that failure to correct the underlying

problem will result in recurrence. *Should You Have the Air Ducts in Your Home Cleaned?*, E.P.A., 1 (1997) https://www.epa.gov/indoor-air-quality-iaq/should-you-have-air-ducts-your-home-cleaned#Summary (EPA 402-K-97-002).

After being informed of the results, Administrator Reed contacted "local companies and could only find one [that] would do the cleaning job, and they were prohibitively expensive." (*Id.*). The filings do not indicate what Reed's standard for "local companies" entailed, which company agreed to do the job, nor what the quoted cost was. It is unclear how long this process took, but over a month after Environmental Consultants submitted their report to Administrator Reed, the situation remained unresolved, and the Plaintiff began filing grievance forms.

From November to December, the Plaintiff submitted multiple grievance forms stating that mold particles irritated his eyes and were causing him to sneeze and cough. (Doc. 13). Documents included in the Defendants' filings indicate the Plaintiff complained of these symptoms contemporaneously. (Doc. 32). The Plaintiff also alleged that he was unable to sleep, had black mucus, and was forced to regularly wash his eyes with water due to the irritation. (Doc. 51). On December 8, the Plaintiff submitted a fourth grievance form where he repeated his statements from the previous grievances and added "I have sent several grievances which have gone unanswered." (Doc. 13).

On December 16, Administrator Reed replied to one of the grievance forms writing that he was "working on that issue Mr. Ash. It takes time." (*Id.*). One of the sergeants—though it is unclear which—replied to another grievance stating that Reed "gave this [grievance form] back to [the sergeant and] said that [Reed was] talking to a company to come in and service the vents." (*Id.*).

Ultimately, after five months, Reed decided to resolve the issue without professional

4

assistance. According to Reed, he:

> [P]urchased additional cleaning supplies and directed the night shift [c]orrectional [o]fficers to clean the ventilation ducts and area around them in all areas of the jail, whether or not there was visible discoloration. Cleaning was done with soap and water and the HVAC.

(Doc. 32).

On February 24, 2022, Sergeant B. Carter and other night shift correctional officers cleaned the cold air return duct and surrounding area, which removed the visible mold.

### C. **COVID-19 Related Claims**

At the time Reed became jail administrator on July 11, 2021, "masks were not given to all inmates; however, [Reed] and [Garden] issued guidance that if a prisoner wished to wear a mask one would be provided, but the prisoner would be required to wear it when around other prisoners or staff." (*Id.*). At that time correctional officers were "not required to wear a mask unless they could not maintain a . . . distance of at least [six] feet for ten minutes or [more]." (*Id.*). (hereinafter "Six-Ten Rule").[4] In other words, if correctional officers were within six feet of prisoners for ten minutes or more, they were required to wear masks; otherwise, correctional officers were not required to wear masks. The Plaintiff claims that this policy resulted in a custom of officers not wearing masks. (Doc. 39).

The jail's quarantine policy also predated Administrator Reed and remained unchanged. Under the jail's policy new prisoners were housed together and screened for COVID-19, separate from the general population. After ninety-six hours, if medical staff determined prisoners showed no symptoms for COVID-19, they were moved to the general population.

On October 13, the Plaintiff filed his first of many grievance forms asking for

---

[4] This rule has been indicated in different ways at different points in the Defendants' filings, often using double negatives and different language. This formulation seems to be the most accurate recitation of the Rule.

correctional officers to wear masks in accordance with the Governor's mandate. On October 18, Sheriff Garden responded reiterating the jail's policy on masks. According to the Defendants' filings, Sheriff Garden directed that the Plaintiff be given a mask. (Doc. 32).

On December 19, the Plaintiff submitted another grievance form stating that he was housed in the same block as new prisoners in quarantine who had been untested for COVID-19. He asked for everyone to be issued masks as neither prisoners nor staff were masking—despite the mandate. The Plaintiff stated that he was scared for his safety. The next day, on December 20, Nurse Ward replied to his latest grievance:

> Medical has nothing to do with where inmates are housed. Per Sheriff [Garden] you may wear a mask (illegible). [Sergeant makes] decisions on where others are placed. Any inmate is welcome to wear masks, just need agreement from officers. Some masks were x1 week.

> (Doc. 13).[5]

Defendant, Sergeant C. Carter, responding to a different grievance form wrote:

> After speak[ing] with [Administrator Reed] we have decided that we will issue you a mask. When you get to have your hour out you will be required to wear your mask at all times in the dayroom. If you are seen not wearing it while you are out, you will be placed on lockdown. For your own safety, if you get moved back to regular population you should practice social distancing to the best of your ability.

> (*Id*.).

In their filings, the Defendants state that these were the orders of Administrator Reed.

On December 23, three days later, the Plaintiff submitted another grievance form to Administrator Reed, writing:

> I was told that I have to remain in my cell until you talk to me. I would like for you to come talk to me so I can take showers and come out of my cell. I was place[d] in "B" block segregation / quarantine?

> (*Id*.).

---

[5] Nurse Ward writes "SGT has decisions [sic] on where others are placed." (Doc. 13). It is unclear which sergeant she is referring to.

Administrator Reed responded that he would "tell the sergeants to put [the Plaintiff] on 23 [and] 1."

On January 11, 2022, the Plaintiff was moved from B block to E block. He alleges that he became "extremely ill" with COVID-19 a week later. Neither Nurse Ward nor Nurse Practitioner Bean[6] believed his symptoms were consistent with COVID-19 and, after a few days of antibiotic treatment, the Plaintiff's symptoms improved.[7] (*Id*.). However, another inmate presented with symptoms that Nurse Ward and Nurse Practitioner Bean believed indicated possible COVID-19 infection. The Defendants claim that the other inmate's illness prompted the E block lockdown while the Plaintiff alleges it was his illness that prompted the lockdown. Regardless, the lockdown was lifted a few days later with no confirmed diagnoses of COVID-19. (*Id*.).

The Plaintiff filed his tenth grievance form to Nurse Ward in April 2022—a month after the Plaintiff pled guilty. The Plaintiff asked for Nurse Ward to provide him documentation related to the January lockdown and his alleged COVID-19 diagnosis. Nurse Ward replied that he had not been diagnosed with COVID-19, nor was a test ordered by his provider, but Nurse Ward provided documents related to the January lockdown as requested.

## II.   LEGAL STANDARD

### A.   **Fourteenth Amendment**

The Fourteenth Amendment to the United States Constitution provides, in relevant part, that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property,

---

[6] Neither Nurse Ward nor Nurse Practitioner Bean are parties to this suit.
[7] The implication, per the Defendants' filings, is that because antibiotics are ineffective against viral infections—such as COVID-19—that his improvement over several days indicate he did not have a COVID infection. The Court will not opine on the merits of this argument at this time.

without due process of law." U.S. CONST. amend. XIV, § 1.

The Fourteenth Amendment's protections also extend to conditions of confinement for pretrial detainees. *Hardeman v. Curran*, 933 F.3d 816, 821-22 (7th Cir. 2019). The Fourteenth Amendment requires that prisons provide inmates, among other things, with "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quoting *Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987)).

In the past, conditions-of-confinement claims pursuant to the Fourteenth Amendment and Eighth Amendment were analyzed under the same test. This test had a subjective and objective component; a plaintiff pretrial detainee alleging that conditions-of-confinement failed to protect them from harm were required to show that (1) the plaintiff pretrial detainee is incarcerated under conditions posing a substantial risk of serious harm ("objective component") and that (2) the officer-defendants showed deliberate indifference to inmate safety or health ("subjective component").

Recently, however, the Supreme Court and the Court of Appeals for the Seventh Circuit have recognized that pretrial detainees are only required to show the objective component of the conditions-of-confinement analysis. *Hardeman v. Curran*, 933 F.3d at 822. When evaluating conditions-of-confinement and failure-to-protect claims brought by pretrial detainees, the plaintiff pretrial detainee need only show that they were incarcerated under conditions posing a substantial risk of serious harm (the objective component). *Id.*

To prove that their incarceration conditions posed a substantial risk of serious harm, a plaintiff pretrial detainee must show that (i) the defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of the plaintiff's case (hereinafter "scienter requirement") and (ii) the defendants' actions were not

8

objectively reasonable (hereinafter "unreasonableness requirement"). *Pittman v. Cty. of Madison*, 970 F.3d 823, 827 (7th Cir. 2020).

Courts cannot apply an objective reasonable analysis "mechanically." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). "Rather, objective reasonableness turns on the facts and circumstances of each particular case." *Id*. (internal quotations and citations omitted). A court evaluates objective reasonableness "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not . . . [based on] hindsight." *Id*.

In respect to jail personnel: "a jail official's response to serious conditions of confinement is objectively unreasonable when it is not rationally related to a legitimate nonpunitive governmental purpose or is excessive in relation to that purpose." *Mays v. Emanuele*, 853 F. App'x 25, 26-27 (7th Cir. 2021) (internal quotations omitted). Additionally:

> A court must . . . account for the legitimate interests that stem from [the Government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.

> *Id.* at 26-27 (quoting *Kingsley*, 576 U.S. at 398) (internal quotations omitted).

While courts "sensibly defer within broad limits to the judgments of prison administrators," *Toston v. Thurmer*, 689 F.3d 828, 830 (7th Cir. 2012)—in other words, courts do not "freely substitute their judgment" for the judgment of prison administrators, *Whitley v. Albers*, 475 U.S. 312, 322 (1985)—deference, even "substantial deference," *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), is not unlimited. Beyond the provision that courts "*sensibly* defer," *Toston*, 689 F.3d at 830 (emphasis added), deference is not blind judicial ratification. When "substantial evidence in the record [indicates] that [jail] officials have exaggerated [their] response" to the "need to preserve internal order and discipline and to maintain institutional security," *Bell v. Wolfish*, 441 U.S. 520, 547 (1979), those jail officials are not entitled to deference.

**C. 42 U.S.C. § 1983 Liability**

If a pretrial detainee plaintiff believes their rights have been violated under the Fourteenth Amendment, they may bring an action under 42 U.S.C. § 1983. When suing under 42 U.S.C. § 1983, a pretrial detainee plaintiff may sue an entity or person in their individual or official capacity.

As § 1983 does not contemplate respondeat superior liability, *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002), a plaintiff must show that a person being sued in their individual capacity, was "personal[ly] involve[d] in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). In other words, a plaintiff pretrial detainee must show that a defendant's personal actions satisfy the scienter and unreasonableness requirements of the Fourteenth Amendment analysis.

To establish liability in their official capacity, a plaintiff must show their "constitutional rights were violated by a policy or custom." *Ratcliffe v. Plasse*, 2023 U.S. Dist. LEXIS 18265 *8-9 (S.D. Ind. 2023) (citing *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694-95 (1978)). "The critical question . . . is whether a *policy or custom . . . caused* a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022) (emphasis added). "To the extent that [a plaintiff] is challenging a facially lawful policy (express or implied), he must provide evidence of a pattern of similar constitutional violations resulting from the policy." *Ratcliffe v. Plasse* at * 9 (citing *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022)).

In contrast to individual liability under § 1983, "*Monell* liability only attaches when the plaintiff shows that the municipality acted with deliberate indifference." *Id.* at *9-10. (citing *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020)). While deliberate indifference no

longer has a place in analyses of *individual* capacity claims alleged by pretrial detainees (the objective component of the Fourteenth Amendment analysis pre-*Hardeman*), the deliberate indifference element has been retained in analyses of *official* capacity claims. *Miranda v. County of Lake*, 900 F.3d 335, 345, 352 (7th Cir. 2018).

To establish deliberate indifference plaintiffs "must show that they were at serious risk of exposure to harm, and the [official] kn[ew] of a substantial risk of harm to an inmate and either act[ed] or fail[ed] to act in disregard of that risk." *Gasaway v. Vigo Cty. Sheriff's Dep't*, 2023 U.S. Dist. LEXIS 78675 *17 (citing *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)) (internal quotations and citations omitted).

In respect to COVID-19, while information about the pandemic was in constant flux, jails were still expected to enact some policies to ensure prisoner safety. Whether a jail's policies were reasonable in response to COVID-19 in respect to Fourteenth Amendment claims is highly fact-dependent. *E.g. Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (failing to provide masks to detainees, guards failing to mask, failed social distancing measures, and lack of sufficient soap or hand sanitizer, were sufficient grounds to uphold a preliminary injunction). However contracting COVID-19 "is not enough to show deliberate indifference because [an official] can avoid liability if [they] responded reasonably to the risk, even if the harm ultimately was not averted." *Gasaway v. Vigo Cty. Sheriff's Dep't* at *17 (citing *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)) (internal quotations omitted).

**<u>Qualified Immunity</u>**

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known. *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Denius v. Dunlap*, 209
F.3d 944, 950 (7th Cir. 2000).

The qualified immunity test has two prongs: (1) whether the defendant violated a
constitutional right, and (2) whether the right at issue was clearly established at the time of the
alleged misconduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Pearson*, 555
U.S. at 232; *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

"If the evidence demonstrates that there may have been a constitutional violation, then
the court should determine whether the right allegedly violated was clearly established at the
relevant time." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (overruled on other grounds). "This
inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a
broad general proposition." *Id*. at 201; *see McNair v. Coffey*, 279 F.3d 463, 465 (7th Cir. 2002).

To show that the law in question was clearly established at the time of the misconduct,
the law "must have placed the constitutionality of the [defendant's] conduct beyond debate" such
that "every reasonable official would understand that what he is doing is unlawful." *Wesby*,
138 S. Ct. at 589 (internal quotations omitted). The law must have been "settled law," that is, it
must have been "dictated by controlling authority or a robust consensus of cases of persuasive
authority." *Id.* at 589-90 (internal quotations omitted). Generally, this requires a high degree of
specificity in the precedent so that every reasonable officer would have been alerted to the law in
the particular circumstances. *Id.*

D. **Summary Judgment**

Summary judgment must be granted "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels*

12

*Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

Nevertheless, the "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotations and citations omitted). *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) ("[A]lthough personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.'" (quoting *Visser v. Packer Eng'g Assocs.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc))).

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmoving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways: it may present evidence that affirmatively negates an essential element of the nonmoving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the nonmoving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

13

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757 (7th Cir. 2021) ("[N]o matter how tempting it might be on summary judgment to be distracted by the sparkle of seemingly compelling facts, [the Court's] assigned task is to take the facts in the light most favorable to the non-moving party.").

To survive summary judgment, a plaintiff asserting a conditions-of-confinement claim is required to "provide evidence from which a reasonable factfinder could conclude that [the defendants] responded in an 'objectively unreasonable' way to unconstitutional conditions of confinement or to a serious medical need." *Wood v. Milwaukee Cnty.*, 2023 U.S. App. LEXIS 21871, *4 (7th Cir. 2023).

III.   **ANALYSIS**

The Plaintiff must show that the Defendants satisfy the scienter and unreasonableness requirements under the Fourteenth Amendment analysis to prevail on his claims. However, as this is a motion for summary judgment filed by the Defendants, the Court must determine if there are any disputes of material fact and, if there are none, evaluate whether the Defendants are entitled to summary judgment as a matter of law. The Court will interpret the evidence in the

light most favorable to the Plaintiff. The Court will also evaluate whether any of the Defendants are protected by qualified immunity.

Here, the Defendants bear the burden of showing there is no genuine dispute of material fact. To survive summary judgment, the Plaintiff must show that a reasonable factfinder could determine that one or more of the Defendants satisfy the scienter and unreasonableness requirements of the Fourteenth Amendment test.

Under § 1983, Reed and Garden can be liable for the policies themselves and the administrative practices of the jail in their official capacity, as well as for their individual actions toward the Plaintiff in their individual capacity. The Plaintiff has sued all Defendants in their *individual* capacity under § 1983, and has sued *only* Reed in both his individual and official capacity. Therefore, Reed may be held liable for his individual actions towards the Plaintiff, *as well as* the jail's policies or widespread practices; Garden, however, cannot. Sherriff Garden—like Sgt. B. Carter and Sgt. C. Carter—can only be liable in his individual capacity.

### A. <u>**Count One**</u>

Only Sheriff Garden and Administrator Reed have been named in Count One. The Plaintiff asserts that the mold infestation was not resolved quickly enough and that night shift correctional officers were not adequately trained or licensed to perform the job. The Defendants assert that the Plaintiff did not suffer actual harm and that the situation was resolved adequately.

Pretrial detainees have an explicit right to "reasonably adequate ventilation [and] sanitation." *Gray v. Hardy*, 826 F.3d at 1005 (7th Cir. 2016). While the mold was not toxigenic, and the mere presence of mold is not enough to establish a constitutional deprivation, the Plaintiff suffered serious symptoms—constant eye and respiratory irritation, difficulty sleeping, and black mucus. These symptoms, in addition to the Plaintiff's unique condition, demonstrate

sufficiently serious harm.

Having established the Plaintiff had an explicit right to adequate ventilation and that the Plaintiff suffered sufficiently serious harm because of the mold, the Court asks whether the five-month delay and non-professional cleaning satisfy the scienter and unreasonableness requirements of the Fourteenth Amendment analysis. Additionally, the Court must determine whether a reasonable factfinder could conclude that the named Defendants are liable in their individual capacity for any alleged violations, Reed is liable in his official capacity, or both.

Garden and Reed had supervisory positions, and, despite Reed's brief absence, both were aware of the mold issue and the Plaintiff's condition. Yet, according to Garden's declaration, Reed was responsible for finding a cleaning company to remedy the mold and there is no indication Garden personally participated in that search. The Plaintiff's various filings do not dispute Garden's lack of involvement. Rather, the Plaintiff alleges that Garden is liable due to his supervisory role. However, because Garden is being sued in his individual capacity alone and § 1983 does not allow respondeat superior liability, any deprivation caused by the delay or failure to remediate must individually involve Garden. As the Plaintiff presents no evidence that Garden was individually involved in the mold remediation effort, Garden cannot be liable under Count One in his individual capacity. Conversely, because Reed was given sole responsibility for remedying the mold issue, Reed can be individually liable under Count One. Additionally, as Reed was in charge of the jail's mold remediation effort, he can be liable in his official capacity as jail administrator.

Having determined that Reed can be individually liable under § 1983, the Court now proceeds with the Fourteenth Amendment analysis. Reed was advised by the Environmental Consultants LLC's report to clean the mold and not run the HVAC system. Yet, it took five

16

months to resolve the mold issue—presuming that Reed was unaware of the mold issue before it was officially diagnosed by the report. Before he directed night shift correctional officers to clean the visible areas of the mold infestation, Reed contacted local companies. According to Reed, only one company offered to do the job, and they were prohibitively expensive. Reed does not give any details as to the scope, breadth, length, nor the thoroughness of his search. Neither did Reed state what the quoted cost was nor why he deemed it prohibitively expensive. Without these concrete facts, on a motion for summary judgment, the Court interprets the evidence most in favor of the nonmoving party.

In the age of the internet, the Court finds it difficult to believe that compiling a list of local companies in a relatively small area and contacting each individually would be a five-month affair.[8] A reasonable factfinder could determine that Reed showed an at least reckless disregard for the consequences his conduct would have on the Plaintiff.

Turning to whether the delay and uncertified cleaning were objectively unreasonable: the issues are the same as above; there are insufficient facts to determine whether the delay and non-professional cleaning were objectively unreasonable. Without specific facts to explain the delay, the Court is incapable of adequately determining whether the delay was rationally related to a legitimate nonpunitive governmental purpose or was excessive in relation to that purpose. While Reed is entitled to substantial deference, deference is not blind judicial ratification; Reed must present some facts—not merely his own conclusions—to support his claims, especially as the party moving for summary judgment.

However, to be liable in his official capacity, a reasonable factfinder must also be able to

---

[8] The Court acknowledges that Reed was at a correctional academy for a month during that time, however, Reed left for the correctional academy on October 8 and the Environmental Consultants, LLC's report was submitted to Reed on September 27, nearly two weeks before his departure. Even if Reed did not deem it necessary to deal with the mold issue before his departure, a four-month delay raises similar concerns as a five-month delay.

17

conclude that the jail's official policy towards the Plaintiff, as overseen by Reed, amounted to deliberate indifference. In this context, as established above, the Plaintiff was at serious risk of exposure to harm, Reed knew there was a substantial risk of harm, and there is an open question as to whether Reed acted or failed to act in disregard of that risk. Therefore, a reasonable factfinder could conclude that Reed was deliberately indifferent and, consequently, is liable in his official capacity.

In short, while Garden has shown there are no disputes of material fact and that he is entitled to summary judgment as a matter of law for his individual involvement, Reed has failed to do so. Therefore, Garden is entitled to summary judgment on Count One; Reed is not.

### B. <u>Count Two</u>

The Plaintiff named Administrator Reed, Jail Sergeants B. Carter and C. Carter; but not Sheriff Garden in Count Two. The Plaintiff alleges that the Defendants exposed him to mold, prisoners in quarantine for COVID-19, and failed to take adequate precautionary measures to prevent illness; all in violation of the Plaintiff's Fourteenth Amendment Rights. The Court will examine each of these issues individually.

#### i) **Exposure to Mold**

The Fourteenth Amendment analysis from Count One also applies here to Count Two as to Reed and the seriousness of the harm suffered by the Plaintiff, however, the question is whether the jail sergeants named in Count Two can also be individually liable. Because the sergeants did not have administrative authority over the prison, they are not responsible for the delay in resolving the mold or the mold cleaning.

As the Plaintiff's cell assignment was changed multiple times, the only plausible way for him to establish that the jail sergeants are liable is to show that the sergeants had direct control

18

over his cell assignments *and* used that authority to personally harm him.[9] It is unclear what part the sergeants played in the Plaintiff's cell assignments. While Nurse Ward responded to one of the Plaintiff's grievance forms saying: "SGT has decisions [sic] on where others are placed," this is not enough to establish liability. (Doc. 13). For one, it is unclear which sergeant had that control and whether that control was exclusive. The only evidence to indicate that one of the sergeants *may* have had some control over the Plaintiff's cell assignments comes from the Plaintiff's testimony at his own deposition. According to the Plaintiff's deposition, though he believed that one of the sergeants ordered that he be moved from one cell to another, he does not make that argument in the filings nor does he allege that the sergeants—even if they did have the authority to reassign cells—moved him in a way that caused him harm or failed to spare him from harm. Therefore, Plaintiff has not presented evidence that either sergeant had authority over his cell assignment. The Plaintiff has not alleged that the sergeants individually did anything or refrained from doing anything that violated the Fourteenth Amendment.

While Sgts. B. Carter and C. Carter are not liable on this issue, it is undisputed that Reed alone was responsible for finding a way to resolve the mold *and* that Reed had at least some control over the Plaintiff's cell assignments. For this reason, and for the reasons articulated in the Court's analysis of Count One, a reasonable factfinder could determine that Reed's actions towards the Plaintiff while the Plaintiff was in B block, both in Reed's individual and official capacity, violated the Fourteenth Amendment.

### ii) Quarantine Claims

Next the Court turns to whether Reed, Sgt. B. Carter, or Sgt. C. Carter violated the Plaintiff's Fourteenth Amendment rights by placing him in the quarantine block, and possibly

---

[9] Perhaps by moving the Plaintiff to a location where his exposure to mold would be worse or not moving him to a location where his exposure to the mold would be lessened.

placing him in the same cell as prisoners who had not been quarantined.

The Plaintiff got sick with what he believed to be COVID-19. A test was not ordered, but the Plaintiff was placed on antibiotics.[10] Additionally, the Plaintiff claims he was unable to sleep over his constant fear and anxiety at the potential consequences of contracting COVID-19 as a childhood survivor of tuberculosis. Given the serious risk posed by COVID-19 and the Plaintiff's reasonable fear that contracting COVID-19 could lead to substantial injury, the Court finds the harm sufficiently serious for a Fourteenth Amendment claim.

Turning to the question of individual liability, as explained earlier, the Plaintiff has not presented evidence that Sgt. B. Carter and Sgt. C. Carter changed his cell assignments. Therefore, they are entitled to summary judgment on the quarantine claims. However, as the jail administrator, Reed *would* be responsible for the Plaintiff's cell assignments. The Court proceeds with a Fourteenth Amendment analysis of Reed's alleged actions or inaction.

The jail's official policy was that new prisoners were booked into the same block and quarantined for ninety-six hours. After ninety-six hours, prisoners would be moved to general population. The Defendants assert that quarantined prisoners were never mixed with general population. However, the Plaintiff claims that he was placed in a cell with a non-quarantined cellmate and that this cellmate was ill.

It is unclear where the Plaintiff was moved to within the quarantine block in relation to other inmates and how full the quarantine block was.[11] It is also unclear who the Plaintiff was

---

[10] It is common knowledge, as a viral infection, that COVID-19 cannot be treated with antibiotics. The fact that his condition improved with antibiotics, the Defendants imply, should confirm their judgment that he did not contract COVID-19. Without opining on the specifics, a reasonable factfinder could determine that the Defendant did contract COVID-19 and that the Plaintiff's improvement over several days was unrelated to the antibiotics.
[11] While the Defendants' memorandum in support of their motion for summary judgment, (Doc. 32), includes a jail roster indicating the Plaintiff's cell assignment during his detention, every name and assignment beyond the Plaintiff's is redacted. It is unclear how close the blocks were in relation to one another and whether the numbers listed at the top of each block's title on the roster list references the number of inmates in those cells or just the number of occupied cells—not considering cells with more than one inmate.

placed in a cell with and whether the cellmate was actively in quarantine. The relevant grievance document asserts that the Plaintiff was housed with newly booked prisoners that had just come in—but the Defendants disagree.

While both sides agree that the Plaintiff had a cellmate for a brief period in the quarantine block, the quarantine status of the Plaintiff's cellmate, Reed's personal involvement in that cell assignment, and whether Reed violated the jail's quarantine policies are genuine disputes of material fact. Given these disputes, the Court must interpret the evidence in the light most favorable to the nonmoving party, and finds that a reasonable factfinder could determine that Reed's individual actions towards the Plaintiff demonstrate an at least reckless disregard for the consequences his conduct would have on the Plaintiff.

In respect to Reed's official capacity, again, the Plaintiff was at serious risk of exposure to harm, Reed knew there was a substantial risk of harm, and whether Reed acted or failed to act in disregard of that risk is an open question. While contracting COVID is not enough to establish a violation—and it is unclear whether the Plaintiff did in fact contract COVID—the Plaintiff's preexisting medical condition is an extenuating circumstance that, as the Plaintiff stated contemporaneously and at the inception of this lawsuit, caused him severe anxiety and lack of sleep. The Plaintiff genuinely believed that his life was at risk. All these facts were known to Reed. Therefore, Reed knew that there was a substantial risk of serious harm. While the jail's official quarantine policy appears to be lawful and reasonable, the Plaintiff alleges that the actual policy and custom of the jail differed from that written policy. Whether the jail followed their quarantine policy and the circumstances surrounding the Plaintiff's cell are all issues of material fact that a reasonable factfinder could use to find that Reed disregarded the risk and, therefore, is liable in his official capacity.

### iii) Failure to Adequately Prevent Illness

The Plaintiff has also alleged that Reed and the jail sergeants failed to take adequate precautionary measures to prevent illness. It is unclear what other measures the Plaintiff may be referring to, though given he repeatedly asked for vaccinations, COVID tests, and masks; the Court infers the Plaintiff to be claiming Reed and the jail sergeants were constitutionally deficient in those areas. For the reasons articulated in the Court's analysis of the quarantine claims, the Court finds that the Plaintiff's alleged harm is sufficiently serious.

Issues of vaccinations and COVID testing are medical decisions that, according to the Defendants' filings, are left to medical personnel.[12] The Plaintiff does not dispute this. Unless an official knows that an inmate is receiving inadequate medical care, a defendant is not liable for medical decisions. *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022). There is no reason to believe that the medical care provided was inadequate and, even if it was, the Plaintiff does not allege that the Defendants knew of its possible inadequacies. Therefore, none of the Defendants are liable under Count Two for claims related to COVID testing or vaccinations.

While vaccinations and testing were left to the discretion of the jail's medical staff, masks were a different matter. The filings clearly demonstrate that decisions on masks were left to the discretion of non-medical jail personnel. The Plaintiff makes a variety of claims about the mask policies themselves as well as the customs of the jail, because the Plaintiff is only suing the Defendants in their *individual* capacity (with the exception of Reed), only their particular individual actions can be taken into account, not the policies as a whole. Reed, however, can be liable for those mask policies.

Decisions on masking and when to give masks, based on the responses to the Plaintiff's

---

[12] Unlike decisions on cell assignments which, according to the response Nurse Ward provided to the Plaintiff's grievances, were not determined by medical staff.

grievances and the Defendants' filings, were up to Reed and Garden. Since Garden is not named in Count Two, he cannot be held liable on the mask issue. While the Plaintiff has named the jail sergeants, he has not alleged that they personally refused him masks; likewise, they are not liable on the mask issue either. Therefore, the question is whether there are genuine disputes of material fact as to whether Reed's actions or inactions related to masks violated the Fourteenth Amendment.

The Plaintiff claims that he repeatedly requested masks. The Defendants state that he was provided masks on the two occasions he asked for one. The Plaintiff does not dispute that he was given a mask after filing two different grievances, but he does argue that he was repeatedly refused a mask *until* he filed those grievances—which appears to contradict the "mask upon request" policy that the jail apparently maintained. Whether the Plaintiff was repeatedly denied masks, why he was denied masks, and whether the jail's custom conformed to their official policy are genuine disputes of material fact. These facts are essential for determining whether Reed acted with an at least reckless disregard for the consequences his actions could have on the Plaintiff. Like the mold issue, Reed is entitled to deference, but he must present *some* facts supporting his choice to deny the Plaintiff masks. Therefore, Reed is not entitled to summary judgment in his individual capacity.

Turning to Reed's liability in his official capacity, there were three aspects of the jail's mask policy: non-mandatory masking, the Six-Ten Rule, and providing masks only upon request. As established earlier, Reed knew of the Plaintiff's medical condition, his fear and anxiety at contracting COVID, and the Plaintiff's multiple requests for masks. Therefore, the only remaining question is whether Reed's actions or inaction in relation to these policies display a disregard for the risk. The Court finds, given the outstanding disputes of material fact present

23

here, that a reasonable factfinder could determine that Reed displayed that disregard.

Additionally, it is unclear whether the policies were lawful given the Illinois Mask Mandate without additional facts. Whether the mask policies are lawful or not shape whether they should be given deference under the Fourteenth Amendment's unreasonability requirement and alters the burden on the Plaintiff. If the policies are facially lawful, the Plaintiff must show a pattern of constitutional violation from the policies; not so if the policies are unlawful. *Ratcliffe v. Plasse* at * 9 (citing *Helbachs Café LLC v. City of Madison*, 46 F.4th at 530). Without key details on these policies and customs that would clarify their legality, implementation, and enforcement; the Defendants have failed to show that there are no genuine disputes of material fact and failed to show they are entitled to summary judgment as a matter of law.

## C. **Count Three**

Count Three alleges that the Defendants disregarded the statewide mask mandate despite the Plaintiff's requests, grievances, and complaints in violation of the Fourteenth Amendment. Count Three has a fundamental flaw: it impermissibly mixes state and federal law.

The United States of America and the State of Illinois are different sovereigns; compliance with the Illinois mask mandate and compliance with the Fourteenth Amendment are independent questions. It is true that the lawfulness of a policy alters the burden on the Plaintiff. *Id*. However, altering the burden on the Plaintiff is not sufficient to establish Fourteenth Amendment liability; even if the Defendants entirely disregarded the mandate, disregarding the mandate does not necessarily violate the Fourteenth Amendment. Certainly, there is some conduct that would violate the Illinois mask mandate *and* the Fourteenth Amendment, but as currently pled, the Plaintiff seems to believe that the Defendants' compliance with the Illinois mask mandate is somehow dispositive. It is not.

24

To prevail on Count Three, the Plaintiff must show that disregarding the mandate, in and of itself, violated the Fourteenth Amendment; the Plaintiff has advanced no such argument. Consequently, the Defendants have established that there is no genuine dispute of material fact and that they are entitled to summary judgment as a matter of law on Count Three.

### D.  **<u>Qualified Immunity</u>**

While the Defendants have failed to show that Reed is entitled to summary judgment on the merits with respect to Count One and Count Two, Reed has invoked qualified immunity. Again, the qualified immunity test has two prongs: (1) whether the defendant violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. Given the Court has established that a reasonable factfinder could conclude Reed violated the Plaintiff's constitutional rights, the question is whether the Plaintiff's Fourteenth Amendment Rights as to the mold issue (Count One) and protection from COVID-19 (Count Two) were clearly established so that any reasonable jail administrator in Reed's position, with Reed's knowledge, would understand their conduct to be illegal.

The Fourteenth Amendment gives prisoners a right to adequate ventilation, medical care, and protection from future harm. Having established that the Plaintiff possessed a clearly established right under the Fourteenth Amendment here, the Court next asks whether every reasonable official in Reed's position would have understood that long delays in mold remediation, refusing to issue masks, and placing the Plaintiff in the same cell as non-quarantined prisoners; would be unlawful. As the Defendant has moved for summary judgment, Reed bears the burden of showing that there is no genuine dispute of material fact here. Reed has failed to meet that burden.

Concerning the mold, Reed knew that continuous exposure to mold in the ventilation

system was causing the Plaintiff serious, perceptible issues; that HVAC systems infested with mold should not be run; and that cleaning was required. Despite this knowledge, there was a five-month delay in resolving the issue—four months if one entirely excuses his absence as a result of being at a correctional academy. While the Court is hesitant to find that the remediation of the problem was inadequate without facts related to the quoted cost of professional cleaning and how extensive the search for a cleaning company was—a reasonable jail administrator would have known that continuous exposure to mold by someone with a preexisting respiratory condition was unlawful, especially when that person displays serious, persistent symptoms, including an inability to sleep.

Concerning COVID-19, Reed was aware of the Plaintiff's condition, the danger COVID-19 presented to him, and the intense anxiety and fear the Plaintiff felt about COVID-19. A reasonable officer in Reed's position would have known that refusing to issue him a mask despite multiple requests, placing a newly booked prisoner in the same cell as him, within the same block where newly booked prisoners were being quarantined; would violate the Plaintiff's rights. Moreover, a reasonable jail administrator would have also known that maintaining a policy that resulted in guards never wearing masks, refusing to issue masks to prisoners, and placing high barriers to receiving masks—even for vulnerable individuals—would be unlawful.

In summary, Reed has failed to show that he is entitled to summary judgment on the grounds of qualified immunity, in either his individual or official capacity, at this stage.

## IV.   CONCLUSION

There are sufficient genuine disputes of material fact such that a reasonable factfinder could conclude that Reed, in both his official and individual capacity, violated the Plaintiff's Fourteenth Amendment rights with respect to Count One and Count Two and that Reed is not protected by qualified immunity. Therefore, Reed is not entitled to summary judgment on Count

One and Count Two.

However, the Defendants have demonstrated that there are no genuine disputes of material fact and that they are entitled to judgment as a matter of law as to Count Three for Administrator Reed. Additionally, the Defendants have shown that there are no genuine disputes of material fact and that they are entitled to summary judgment as a matter of law as to all counts for Sheriff Garden, Sgt. B. Carter, and Sgt. C. Carter.

Accordingly, the Court **GRANTS in part and DENIES in part** summary judgment. The Court **GRANTS** summary judgment as to Sgt. B. Carter, Sgt. C. Carter, and Sheriff Andy Garden on all counts. The Court **GRANTS** summary judgment as to Administrator Reed on Count Three in both his official and individual capacity, but **DENIES** summary judgment as to Reed, in both his official and individual capacity, on Count One and Count Two.

**IT IS SO ORDERED.**
**DATED:  March 27, 2024**

*s/ J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**